UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X
CAMERON GARDIN                              :     Civil Action No.: 1:18-cv-02199
                                            :
                                            :     **THIRD AMENDED COMPLAINT**
            Plaintiff,                      :     to remedy discrimination on basis
       v.                                   :     of disability stemming from HIV
                                            :
DELTA AIR LINES, INC.,                      :
                                            :
                                            :
                                            :
            Defendant.                      :     **Jury Trial Demanded**
-----------------------------------------------------X

Plaintiff, Cameron Gardin, by and through his undersigned attorneys, complaining of Defendant, Delta Air Lines, Inc., brings the instant action requesting judgment in his favor, and against Defendant, and in support thereof, allege, upon information and belief, as follows:

## NATURE OF ACTION

1. Plaintiff, Cameron Gardin, a former employee of Delta Air Lines brings this lawsuit against his previous employer, Delta Air Lines (Delta), to remedy discrimination based upon his HIV status on the part of Delta. Delta subjected Plaintiff to disability discrimination and a hostile and discriminatory work environment in violation of federal law.

## PARTIES

2. Plaintiff, Cameron Gardin, is an adult individual, residing at 110 29th Ave Drive, NW, Apt. 114, Hickory, NC 28601.  At all times material hereto, Plaintiff was employed by Defendant, Delta Air Lines, as a Flight Attendant.  In his capacity of an employee of Delta, Plaintiff was a Flight Attendant based in New York and has worked as a Flight Attendant for Delta for over 9 years.  Plaintiff is HIV positive.  Due to a harassing and hostile work environment, Plaintiff had no other choice than to resign from his job on December 8, 2017.

3. Delta Air Lines, Inc. is a corporation duly organized and existing under the laws of the State of Delaware, with headquarters in Atlanta, Georgia. Delta employs more than 80,000 employees worldwide and, as of October, 2016, flew to 54 countries on 6 continents. In 2013, Delta was the world's largest airline in terms of passengers carried, at 120.6 million passengers. Delta has numerous key hubs and markets including but not limited to New York, at JFK International Airport and LaGuardia Airport.

## JURISDICTION AND VENUE

4. The above paragraphs are incorporated herein by reference.

5. Jurisdiction in this Honorable Court is based on federal question 28 U.S.C. §1331; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

6. Venue is proper in the Eastern District of New York, as the facts and transactions involved in the discrimination complained of herein occurred in large part in this judicial district. at JFK International Airport, in Queens County, New York.

## STATEMENT OF FACTS

7. The above paragraphs are incorporated herein by reference.

8. Delta, in a number of unlawful, intimidating and discriminatory acts, created a discriminatory and hostile work environment for Plaintiff.

9. Plaintiff was employed by Delta from March 4, 2008 until December 8, 2017, when he was forced to resign. Resignation was Plaintiff's only choice due to the hostile environment that Delta created by intimidating Plaintiff and by Delta's unfair and discriminatory actions toward Plaintiff.

10. Plaintiff was diagnosed with HIV in or around October 2008, not long after he began working for Delta. Due to his diagnosis, Plaintiff was granted approved unpaid work absences under the Family and Medical Leave Act (FMLA) in or around early 2009.

11. Plaintiff worked full time until about November 2012, when he was forced to take an extended leave of absence due to HIV-related complications.

12. In order to receive FMLA leave, Plaintiff submitted his doctor's certifications to Sedgwick, a third-party administrator of FMLA claims for Delta. Sedgwick is Delta's agent

13. Working with Sedgwick was very difficult for Plaintiff. In 2012, Plaintiff's doctors faxed forms to Sedgwick over a dozen times – each time Sedgwick claiming it had not received the forms. It was ultimately discovered that that the fax transmissions were found in a Sedgwick office in Lexington, Kentucky but not before a very exhausting period with Sedgwick and Plaintiff's doctors stating that they would not send another fax transmission.

14. Plaintiff was so seriously ill that he was mostly wheelchair bound and out of work for over two years until March 2015. During this time, Plaintiff was receiving Supplemental Security Income (SSI). Delta was aware of Plaintiff's SSI benefits, in fact Delta required that Plaintiff receive SSI as a condition of being able to return to work.

15. Delta began making Plaintiff feel uncomfortable immediately upon his return to work in or around March 2015. On his first day back at work, Plaintiff needed to be escorted to Delta's main office to get a new identification card. The employee who took Plaintiff to get his ID card noticed that he was limping, a complication from his HIV and stated, "Are you sure you are ready to come back to work?"

16. Upon his return to work, Plaintiff had difficulty getting FMLA time as he had to accumulate the requisite number of hours in order to become eligible for FMLA.

17. Notwithstanding, Plaintiff needed to call out from work numerous times in 2015 for medical reasons, which Plaintiff explained to his managers.

18. Delta's records show Plaintiff was given numerous "verbal coaching" for reliability stemming from unscheduled absences that were related to Plaintiff's HIV in 2015.

19. On September 8, 2015, for example, Plaintiff met with his supervisor, Giacomo Suriano. Suriano wrote:

> This evening Cameron (Plaintiff) was issued a Written coaching by Kris Sooknanan and myself. I called into the meeting and explained to Cameron why this written coaching was being issued and wanted him to understand my concern and emphasized the need for him to demonstrate sustained improvement in the area of reliability. **Cameron also did share that there are medical reasons why he has had to call out as much as he has**. I asked him to stay connected with me and asked that he also call admin services and Sedgwick. Cameron appreciated the support and is focused on improving his reliability.

20. In October 2015, Plaintiff submitted his doctor's certifications to Sedgwick.

21. Sedgwick records show that Plaintiff's October 2015 FMLA request was initially denied by Sedgwick.

22. Eventually, Sedgwick approved intermittent FMLA leave for Plaintiff from October 2015 through November 2016.

23. Notwithstanding, Delta's internal performance report shows that Delta continued to mark Plaintiff as accountable for absences in October, November, and December 2015. Plaintiff also received another verbal coaching in October 2015. These absences were again related to Plaintiff's health condition.

24. This culminated with Delta issuing a Corrective Action Notice (CAN) for reliability in December 2015. A CAN is a serious probationary period, during which time a Delta employee is not eligible for special assignments or a transfer into another department.

25. David Gilmartin is Delta's base director in New York and oversees approximately 4,500 Delta employees at JFK and LaGuardia airports. Mr. Gilmartin met with Plaintiff on December 29, 2015.

26. During this meeting Plaintiff told Gilmartin directly that he had HIV.

27. Gilmartin's notes from the meeting show "Cameron advised his condition can likely never be cured, but managed with medication."

28. Plaintiff was terrified to call in sick even though he had a FMLA approved condition, for fear that he would be terminated.

29. On or about February 26, 2017, Plaintiff began experiencing issues with an HIV-related condition called HIV myelopathy. The myelopathy would cause uncontrollable right-sided muscle spasms that would make him fall to the floor if he was standing. Delta was aware of Plaintiff's myelopathy.

30. Immediately following this flare-up, on or about March 3, 2017, Plaintiff was disciplined with a "FCAN," which stands for final corrective action notice. Delta also sent letter to Plaintiff explaining that the reason for the FCAN was reliability.

31. The letter explained that Plaintiff was allegedly absent 18 days on 5 occasions.

32. In fact, many of the dates in the letter should have been excused. For example, the letter cited an absence of 4 days around September 4, 2016. Plaintiff provided Delta with a note from his doctor explaining that Plaintiff had treatment during those dates.

33. The letter cited 6 days when Plaintiff was absent around February 26, 2017. This is when Plaintiff had a flare-up of his HIV myelopathy. Plaintiff told Delta (and Sedgwick) that this absence was for medical reasons.

34. David Gilmartin (Delta's base director in New York) met with Plaintiff on March 20, 2017 regarding the FCAN. Gilmartin's notes show:

> Met with (Plaintiff) on behalf of FSM John Marsh to issue FCAN due to poor reliability. Went over the recent absences after the CAN (corrective action notice) was issued as well as the previous coachings. **FA does not fee(l) these should be accountable as he was sick and did provide Dr's certification for each. We discussed the concern was not validity of the absences but rather the volume and the impact to the operation.** Cameron mentioned that he is in the process of getting FMLA and has an appointment with his neurologist in the coming months. I mentioned that if his FMLA gets approved this letter can be reviewed.

35. In early April 2017, Plaintiff submitted his doctor's certifications to Sedgwick.

36. Plaintiff was approved for intermittent FMLA by Sedgwick from April 1 to October 1, 2017.

37. Sedgwick records from April 3, 2017, show that Plaintiff called Sedgwick to advise that he had also been absent earlier in the month because of the same medical condition. Sedgwick notes show:

> EE (Plaintiff) stated he did have an absence earlier in the month and will call back with that date.
>
> …EE stated that he did not call (the absences) in as FMLA as he did not yet have it, and wouldn't see his neurologist until July.
>
> EE asked MD wanted to ask about a letter from Delta. Stating he was reprimanded for missing days and has a list of past illness dates. Ex advised we can usually only go back 30 days in the past and the illness needs to be stated as FMLA. EE stated he called them in as illness as he did not yet have FMLA.
>
> He has a total of 3 MDs and information may change after seeing specialists. Ex advised that we may only use the most recent piece of medical. Advised to have GP fill out forms and acquire new information from specialists and if changes need to be made, she may update the forms with initials and dates changes made.

38. In fact, Delta's policy is to retroactively correct absences once it receives doctor approval. Plaintiff should have been approved for his aforesaid HIV myelopathy flare-up in late February and early March 2017.

39. On May 28, 2017, Delta's internal performance report shows Plaintiff's supervisor, John Marsh gave Plaintiff a "Informal Verbal Coaching" for reliability. The reason was an unscheduled absence. Marsh's notes show: "reviewed reliability, **reminded Cameron (Plaintiff) of his need for improvement as the next step is a review for term** (termination)."

40. Plaintiff also directly told Marsh that he had HIV.

41. On June 24, 2017, Plaintiff had a flare-up of his aforesaid myelopathy condition, which caused him to be absent from work. Plaintiff reported the issue to Sedgwick, which recommended approving Plaintiff's intermittent FMLA for that date.

42. Notwithstanding, Delta's performance records show Plaintiff's absence on June 24, 2017 was marked as "FCOK", which stands for "failure to cover okay to fly." Delta held Plaintiff accountable for this absence.

43. On July 7, 2017, Plaintiff had another flare-up of his myelopathy condition, which caused him to be absent from work. Plaintiff reported the issue to Sedgwick, which again recommended approving Plaintiff's intermittent FMLA for that date.

44. On July 18, 2017, Sedgwick's claim's manager Tracy Kohn wrote:

> Recommend approval of absence on 07/06-08 due to flare up, EE (Plaintiff) had a flare up while at the airport and called as soon as he knew he was unable to do his trip EE stated that he was fine and can not tell when flare ups are going to occur

45. Again, Delta's performance records show Plaintiff's absence on July 7, 2017 was marked as FCOK. Delta held Plaintiff accountable for this absence.

46. John Marsh was aware of Sedgwick's approval of Plaintiff's July absence. Still, Plaintiff received a "informal verbal coaching" for reliability. The reason was "Failure to Cover/be Available."

47. Delta's performance report shows that Marsh spoke to Plaintiff on August 8, 2017 (several weeks after Sedgwick's approval of Plaintiff's absence). Marsh's note shows:

> Called and spoke with Cameron (Plaintiff) and **advised this is his last warning. The next occurrence, Late/MTO/CFSM/UPS will be a review for termination.** Cameron understood the seriousness of his situation.

48. The repeated coaching about reliability and threats that Plaintiff would be terminated were harassment and created a hostile work environment for Plaintiff.

49. In addition to the unwarranted discipline that was documented in Delta and Sedgwick's records, Plaintiff experienced a number of other hostile situations in summer 2017.

50. On one marked occasion, Plaintiff was called into the management office and met by his manager John Marsh, and another manager Shirley Whitehead, with whom Plaintiff was not very familiar. Instead of speaking to Plaintiff directly about why he had been called into the office, Mr. Marsh ignored Plaintiff and told Shirley, right in front of Plaintiff, that Plaintiff was a problem and instructed Shirley to explain to Plaintiff the stress that he was causing their work environment. This encounter was extremely embarrassing, hurtful and awkward for Plaintiff.

51. On another particularly disturbing occasion, a duty manager called Plaintiff into the office and said due to his absences he was a huge burden on the system. Plaintiff got very emotional and broke down in tears about this because he was so frustrated with the situation and how Delta was treating him. Upon leaving the meeting, the manager told Plaintiff "not to forget to smile" when he left the office and told him not to tell anyone what had transpired.

52. Plaintiff's manager, Mr. Marsh would continuously call Plaintiff on days when he was not even scheduled to work and would tell him if he had any more absences there was nothing he could do to help him. This constant harassment became near impossible for Plaintiff to handle.

53. One of Plaintiff's goals while at Delta was to become part of the Purser Program, a managerial program for Delta's international flight attendants. Plaintiff shared this aspiration with Mr. Marsh several times. However, each time Plaintiff mentioned his desire to become a Purser, Mr. Marsh shut him down immediately and told Plaintiff that he would never become one. This was extremely discouraging to Plaintiff.

54. The reason Plaintiff was not eligible to be a Purser was because he had received a CAN and FCAN – but these disciplines were not warranted because Delta knew Plaintiff's absences were related to a serious health condition and that Plaintiff had FMLA approved absences, which should have been excused.

55. In another instance, Plaintiff suffered from a spasm at the JFK International airport and was put in a wheelchair. This incident was not only very humiliating to Plaintiff but also caused him to be very emotional as it reminded him of the time he was wheelchair bound for almost two-years. Around the time of day Plaintiff suffered this episode, he was scheduled to have yet another meeting with one of the Delta managers who was located in another part of the airport. The manager not being concerned about Plaintiff's health, became very upset with Plaintiff as he was unable to get to the area of the airport in time for the meeting.

56. Upon information and belief, Delta was aware of Plaintiff's condition that caused Plaintiff to have uncontrollable spasms.

57. In addition, during 2016 and 2017, Delta frequently tested Plaintiff for drugs and alcohol after Plaintiff was absent.

58. Upon information and belief, Plaintiff was unfairly targeted and discriminated against by having to undergo this non-random drug and alcohol testing. Understandably, this caused

Plaintiff substantial humiliation. Furthermore, it is difficult to imagine that these drug/alcohol tests were random and not targeted.

59. Beyond the egregious harassment directed toward Plaintiff pertaining to a private and personal medical diagnosis by Delta managers, these same Delta managers would routinely find an issue with Plaintiff's appearance.

60. In summer 2017, a number of times, multiple managers would harass Plaintiff because Plaintiff was wearing a union pin, even though the pin was in dress code compliance pursuant to the Delta Employee Handbook. Upon information and belief, the harassment concerning Plaintiff's uniform was nothing more than pretext unlawful disability and/or FMLA discrimination.

61. In another incident that summer, Plaintiff was called to the front desk to be disciplined about his hairstyle. Plaintiff was told that his hairstyle was distracting to the customers. However, it was the exact same hairstyle Plaintiff had worn for the past two years. Plaintiff asked them to point to any Delta regulation, showing that his haircut was out of compliance. They could not do so.

62. During September 2017, Plaintiff missed almost the whole month of work due to illness and doctor appointments. Though Plaintiff still had FMLA time left, Delta encouraged Plaintiff to go on short term disability, which began in or around late October 2017. However, even with the short-term disability, he had a hard time getting absences approved.

63. Around summer 2017, Plaintiff also requested a different position with less travel so that Plaintiff could be closer to his home base and near his doctors. Plaintiff was told by management that a lateral transfer would not be possible because Plaintiff had a FCAN.

64. Plaintiff was advised that if he went out of work and had a return to work date without any restrictions stemming from his illness, Delta would eventually remove the FCAN.

65. This news was devastating to Plaintiff. He felt hopeless. He was persistently being harassed due to his illness and Delta refused to make any reasonable accommodations for him. Plaintiff felt that his only choice was to resign. Plaintiff resigned on December 8, 2017.

66. Plaintiff's resignation email to his supervisor at Delta stated:

> I have spoken with you prior and have discussed some challenges I have faced with my absence. The challenge of communicating between Delta, Sedgwick, and now Metlife are extremely challenging. Nothing that I have discussed with one of the above has matched or coincided with the other. I have been playing cat and mouse the entire absence and have faced to many challenges making the system at Delta work.
>
> …in the last year I have faced challenges and some that I feel are very unfair in a lot of ways. I was placed on a 36-month probationary period even after explaining the challenges I had in obtaining FMLA, as well as the challenges I was facing when I would come to work. I was placed in offices with people that weren't my manager to be given written reprimands, with them knowing they had no idea about what was going on .I was placed in uncomfortable situations where I had to explain medical things that were going on with me so that people could try to understand my situation.
>
> I was brought to tears at the delivery of my 36 month probation and then told not to forget to smile as I was leaving the offices. These things are however most of the deciding factors that I have sat and pondered while I have been gone and thought to myself, I don't know if I want to return to that kind of atmosphere.

67. Plaintiff has exhausted said remedies after filing with the EEOC and other state agencies and has obtained a right to sue.

## STATEMENT OF CLAIMS

### COUNT I.
### INTERFENCE WITH FMLA RIGHTS

68. The above paragraphs are incorporated herein by reference.

69. Delta was Plaintiff's "employer" as defined by the FMLA.

70. Plaintiff was an eligible employee under the FMLA

71. Defendant interfered with Plaintiff's rights protected under the Family Medical Leave Act, 29 U.S.C. § 2601, et seq.

## COUNT II.
## RETALIATION IN VIOLATION OF FMLA

72. The above paragraphs are incorporated herein by reference.

73. Delta unlawfully retaliated against Plaintiff in violation of the FMLA.

74. Delta conduct constitutes unlawful retaliation against Plaintiff in violation of Delta rights under the FMLA, 29 U.S.C. §2615(a).

75. Delta acted purposely and with malice with the intent to injure Plaintiff.

76. As a direct and proximate result of Delta's actions and unlawful retaliation against Plaintiff, Plaintiff has suffered mental and emotional damages, Plaintiff's employment was constructively terminated and Plaintiff has incurred, and will continue to incur, substantial economic damages.

## COUNT III.
## REFUSAL TO REASONABLY ACCOMMODATE - ADA

77. The above paragraphs are incorporated herein by reference.

78. Plaintiff is an individual with a disability as the term is defined in Section 3(2) of the ADA, 42 U.S.C. Section 12102(2). Plaintiff has HIV, which substantially limits one or more of his major life activities, has a record of such impairment and is regarded by Delta as having impairment.

79. Plaintiff is a qualified individual with a disability within the meaning of Section 101 (8) of the ADA, 42 U.S.C. Section 12111(8), in that Plaintiff is an individual with a disability, who

with reasonable accommodations, such as job restructuring, can perform the essential functions of his position with Delta.

80. Plaintiff requested a different position with less travel as it would be easier on his health. Plaintiff was told by management that a lateral transfer would not be possible, as he was on final written notice.

81. Delta failed to engage in a constructive, interactive process concerning Plaintiff's disability.

82. Delta failed to make reasonable accommodations to Plaintiff.

83. Delta's failure to make reasonable accommodations to Plaintiff's disability constitutes discrimination against Plaintiff with respect to the terms, conditions or privileges of his employment. Delta's failure to act is in violation of Section 102(b)(5)(A) of the ADA, 42 U.S.C. Section 12112(b)(5)(A).

84. As a direct and immediate result of Delta's Discrimination on the basis of disability, Plaintiff has suffered lost wages, lost benefits and lost employment opportunities and is entitled to damages.

## COUNT IV.
## ADA RETALIATION

85. The foregoing paragraphs are incorporated herein by reference.

86. In addition and/or in the alternative, the foregoing adverse employment actions taken against Plaintiff constituted retaliation for Plaintiff's lawful requests and exercise of rights under the ADA, including subjecting Plaintiff to a hostile work environment.

## COUNT V.
## CONSTRUCTIVE DISCHARGE ON THE BASIS OF DISABILITY

87. The above paragraphs are incorporated herein by reference.

88. Plaintiff is a qualified individual with a disability within the meaning of section 101(8) of the ADA, 42 U.S.C. Section 12111(8), in that he is an individual with a disability, who, with reasonable accommodation, can perform the essential functions of his position at Delta.

89. Reasonable accommodation within the meaning of 42 U.S.C. Section 12111(9)(b), includes job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers of interpreters, and other similar accommodations for individuals with disabilities.

90. Delta's constructive discharge of Plaintiff in violation of Section 102 of the ADA, 42 U.S.C. Section 12112, which prohibits discrimination on the basis of disability, in that Delta constructively discharged Plaintiff, solely on the basis of his disability, despite his ability to perform the essential functions of his position at Delta.

91. The dispute surrounding Plaintiff's FMLA approved absences due to his illness were a pretext for discrimination based on Plaintiff's disability.

92. As a direct consequence of Delta's constructive discharge of Plaintiff, Delta discriminated against Plaintiff with respect to the terms, conditions or privileges of employment.

93. Delta's discriminatory conduct was to Plaintiff was taken with malice and with reckless disregard to Plaintiff's federally protected rights.

94. As a direct and proximate result of Delta's discrimination Plaintiff has been deprived of economic benefits, including but not limited to, lost wages, lost fringe benefits, loss of job opportunities and pain and suffering, for which he is entitled monetary damages.

95. Delta's constructive discharge of Plaintiff has caused, continues to cause and will cause Plaintiff extensive damages for future pecuniary losses including wages and benefits, mental torment, future pain and suffering, loss of enjoyment of life and other non-monetary losses.

## COUNT VI.
## VIOLATION OF THE NEW YORK HUMAN RIGHTS LAW (NYHRL)

96. The above paragraphs are incorporated herein by reference.

97. The above acts and practices of Delta constitute unlawful discriminatory employment practices under the New York Human rights Law.

98. As a result of Delta's discriminatory acts, Plaintiff has suffered and shall continue to suffer monetary damages and damages for mental suffering and humiliation unless and until the Court grants relief.

## COUNT VII.
## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW

99. The above paragraphs are incorporated herein by reference.

100. The above acts and practices of Delta constitute unlawful discriminatory employment practices under the New York City Human rights Law.

101. As a result of Delta's discriminatory acts, Plaintiff has suffered and shall continue to suffer monetary damages and damages for mental suffering and humiliation unless and until the Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff and against Delta, and Order the following relief:

a. A declaratory judgment declaring that Delta has illegally discriminated against Plaintiff;

b. Declaring the acts and practices complained of herein are in violation of the ADA 42 U.S.C. Section 12101 et. seq., FMLA and NY State Human Rights Law;

c. Enjoining and permanently restraining the aforesaid violations;

d. Require Delta to pay all earnings Plaintiff would have received, but for the discriminatory practices, including but not limited to, front and back pay and otherwise lost and future benefits;

e. Payment of compensatory and punitive damages, to all Plaintiffs in an amount to be determined at trial; and,

f. An award of Plaintiff's attorneys' fees and costs of suit as provided by the FMLA and ADA, and NY State Human Rights Law.

g. Such other relief as this honorable Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial as to all issues so triable herein.

[remainder of page left intentionally blank]


Respectfully submitted,

**MILDENBERG LAW FIRM**
/s/ Brian R. Mildenberg, Esq.
Brian R. Mildenberg, Esq.
PA Attorney ID No. 84861
1735 Market St.,
Suite 3750
Philadelphia, PA 19103
215-545-4870
Fax: 215-545-4871
brian@mildenberglaw.com
www.MildenbergLaw.com
Attorney for Plaintiffs
(*pro hac vice*)

**WEISBERG LAW**
/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esq.
PA Attorney ID No. 85570
David A. Berlin, Esq.
PA Attorney ID No. 314400
7 South Morton Ave
Morton, PA 19070
610-690-0801
Fax: 610-690-0880
Attorney for Plaintiffs
(*pro hac vice*)

**PAWAR LAW GROUP P.C.**

*/s/ Vik Pawar*
Vik Pawar, Esquire
20 Vesey Street, Suite 1210
New York, New York 10007
(212)-571-0805 (phone)
(212)-571-0938 (fax)
(Local Counsel)

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CAMERON GARDIN | : | |
| Plaintiff, | : | NO. 1:18-cv-02199 |
| v. | : | |
| DELTA AIRLINES, INC. | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Matthew B. Weisberg, Esquire, hereby certify that on this 7th day of October 2019, a true and correct copy of the foregoing Third Amended Complaint was served via ECF, upon the following parties:

Ira G. Rosenstein, Esquire
Michael F. Fleming, Esq.
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178

**WEISBERG LAW**

/s/ Matthew B. Weisberg
Matthew B. Weisberg, Esquire
PA Attorney ID #: 85570
7 S. Morton Avenue
Morton, PA 19070
(610) 690-0801
(610) 690-0880 – Fax
mweisberg@weisberglawoffices.com
*Attorney for Plaintiff (Pro Hac Vice)*